UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Roscoe Chambers,  )
            Petitioner,  )
              )    No. 20 CV 50135
v.  )    Judge Iain D. Johnston
              )
Andrew Ciolli,[1]  )
           Respondent.  )

## MEMORANDUM OPINION AND ORDER

Petitioner Roscoe Chambers seeks restoration of 14 days of good conduct time that he lost for allegedly assaulting a corrections officer. For the reasons that follow, his petition [1] is denied.

## BACKGROUND

Mr. Chambers is an inmate at AUSP Thomson. He is serving a 360-month sentence after being convicted of multiple federal drug offenses in the Southern District of Iowa. *See United States v. Roscoe Chambers*, Case No. 12 CR 71 (S.D. Iowa). According to the Bureau of Prisons website, his projected release date is September 15, 2038.

Mr. Chambers lost 14 days good conduct time after an incident on September 27, 2019, at his current facility, AUSP Thomson. According to a Bureau of Prisons incident report, a calculated use of force team was dispatched to Mr. Chambers cell, Cell 19, Range 2 of E-Unit. Dkt. 20 at 83. When a team member attempted to apply hand restraints to Mr. Chambers, Mr. Chambers grabbed the officer's thumb and then squeezed and twisted it in an aggressive manner. *Id*. Based on the incident report, on September 30, 2019, the Bureau of Prisons referred the allegations to the FBI, but on October 2, 2019, the FBI reported back that it was declining to pursue the matter. *Id.* at 86-87. After the FBI declined to pursue the matter, on October 2, 2019, Lieutenant Murillo delivered a copy of the incident report to Mr. Chambers. *Id.* at 83. That same day Lieutenant R. Williams investigated the incident, spoke to Mr. Williams, and reported in a written investigation that Mr. Chambers had stated, "I didn't do it." Dkt. 20 at 84. In his report, Lt. Williams concluded that the evidence he had gathered supported charging Mr. Chambers with assault, Prohibited Act Code 224, and he referred the matter to the Unit Disciplinary Committee. *Id.* Officer D. Boyer conducted the UDC hearing on October 4, 2019. *Id.* at 83. During the hearing, Mr. Chambers stated that he had not assaulted anyone, and that video of the incident would reveal he was the one who had been assaulted by corrections officers. *Id.* Officer Boyer referred the matter to the Disciplinary Hearing Office. *Id.* DHO Officer T. Ingram held Mr. Chambers' disciplinary hearing on November 6, 2019. *Id.* at 80. In a written decision, the disciplinary officer found that based on the greater weight of the evidence,

---

[1] The warden of AUSP Thomson is now Andrew Ciolli. Pursuant to Federal Rule of Civil Procedure 25(d), he is automatically substituted as the defendant to this suit.

Mr. Chambers had committed the prohibited act of assault and sanctioned him as follows: 14 days loss of good conduct time, 10 days of disciplinary segregation, and 90 days loss of e-mail and visiting privileges. *Id.* at 81-82.

In a petition filed under 28 U.S.C. § 2241, Mr. Chambers seeks the return of his 14 days of credit. In support, he argues that he was denied good conduct time without due process because (1) camera footage shows that he was handcuffed and the one being assaulted by staff; (2) he was never given fair notice of what conduct is prohibited, a violation of Bureau of Prisons Program Statement 5290.14; (3) it was a conflict of interest for Lt. Murillo to deliver the incident report to him; (4) the case manager lied when saying that the incident report was never sent to the FBI; (5) he was denied the right to present witnesses and exculpatory evidence at the disciplinary hearing; (6) the incident report was delivered five days after the incident to intimidate and retaliate against Mr. Chambers; (7) staff violated 28 C.F.R. § 541.5 and § 541.7(a)(4);[2] (8) the FBI never prepared a report; (9) there was no Special Investigator Supervisor report; and (10) the Bureau of Prisons did not process his BP-10 within 30 days as required under 28 C.F.R. § 542.15. The petition is now fully briefed.

## ANALYSIS

Persons in the custody of the Bureau of Prisons have a liberty interest in good conduct time, and can challenge the loss of good conduct time by filing a motion for habeas relief under 28 U.S.C. § 2241. *See Jackson v. Carlson*, 707 F.2d 943, 946 (7th Cir. 1983). Although prisoners have due process rights in prison disciplinary proceedings, such proceedings "are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). As a result, a prisoner has received due process if each of the following requirements are met: the prisoner (1) receives written notice of the disciplinary charges at least 24 hours before a disciplinary hearing; (2) has an opportunity to be heard before an impartial decision maker; (3) is able to call witnesses and present evidence that will not be unduly hazardous to safety or correctional goals; (4) receives a written statement of the evidence relied on and the reason for the decision; and (5) receives disclosures of any exculpatory evidence. *Id.* at 564-66.

The disciplinary decision will be upheld as long as it is supported by "some evidence in the record," which is a meager standard. *Scruggs v. Jordan*, 485 F.3d 934, 941 (7th Cir. 2007) ("once the meager threshold has been crossed our inquiry ends."). On habeas review, the court does not reweigh the evidence or determine credibility. *Meeks v. McBride*, 81 F.3d 717, 720 (7th Cir. 1996). Rather, the court merely looks to whether there is *any* evidence in the record supporting the disciplinary decision. *See Henderson v. U.S. Parole Com'n*, 13 F.3d 1073, 1077 (7th Cir. 1994) (a court can overturn a disciplinary decision only if no reasonable adjudicator could have found the inmate guilty of the offense based on the evidence presented).

A federal prisoner must exhaust his federal administrative remedies before seeking habeas relief in court, but the requirement is not jurisdictional and so is waived if not raised by

---

[2] Mr. Chambers refers to § 541.7(4)(a), but no such section exists and so the Court assumes he intended § 541.7(a)(4).

the respondnet. *Del Raine v. Carlson*, 826 F.2d 698, 703 (7th Cir. 1987). The respondent concedes that Mr. Chambers exhausted his administrative remedies. Dkt. 20 at 5.

Before focusing on the ten ways in which Mr. Chambers contends he was denied due process, the Court first addresses an argument he raises in his reply brief that the respondent's counsel violated 28 C.F.R. § 50.15 by responding to his petition, and so the response should be disregarded. Reply [21] at 1. Specifically, he contends that respondent's counsel did not obtain authorization from the United States Attorney General to appear for the respondent. *Id.* In fact, the regulation allows the Attorney General "or his designee" to decide whether to represent a federal employee. *See* 28 C.F.R. § 50.15. Other than Mr. Chambers' bald assertion, he points to no evidence that the respondent's counsel's appearance is unauthorized. Nor does the Court have reason to believe that counsel appeared without authorization, or to address the argument further.

    1.    **Camera Footage**

Mr. Chambers contends that camera footage of the incident shows that he was the one being assaulted by corrections officers, not the other way around. His argument appears to be that in light of the video, there was insufficient evidence to find that he assaulted a corrections officer. But according to the disciplinary hearing officer's report, the officer's determination that Mr. Chambers had committed an assault was based on the corrections officer's statement in the incident report that Mr. Chambers had grabbed and twisted the officer's thumb, a staff injury assessment indicating that the officer's thumb had been injured, and a statement by the staff representative who represented Mr. Chambers during the hearing that the camera footage was inconclusive because it depicted only the backs of corrections staff. The hearing officer also considered Mr. Chambers' statements that he assaulted no one and was the one assaulted, but determined that based on the greater weight of the evidence, Mr. Chambers had assaulted the corrections officer. Some evidence, including his staff representative's description of what the camera footage depicted, supported the hearing officer's decision and so Mr. Chambers has not established a due process violation based on the sufficiency of the evidence.

In his reply brief, Mr. Chambers adds the argument that he was denied due process because the hearing officer never viewed the camera footage. Arguments first raised in a reply brief are generally forfeited. *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009). But even if the argument is not forfeited, Mr. Chambers has cited to no authority holding that due process requires a hearing officer to view camera footage him- or herself. The hearing officer relied on a description of the camera footage offered by Mr. Chambers' own staff representative, and thus had some evidence upon which to conclude that the footage was inconclusive. *See Estrada v. Holilnka*, 420 Fed. Appx. 602, 604 (7th Cir. 2011) ("Even without watching the video, the hearing officer had more than a 'modicum' of evidence to support her decision, and that was all that was required to meet the 'lenient' evidentiary standard in a prison disciplinary hearing."). In addition, this Court has viewed the footage of the incident at Cell 19 *in camera*, which was provided in connection to one of Mr. Chambers' civil lawsuits, *see Chambers v. Mayberry*, No. 19 CV 50319 (N.D. Ill.). The Court concurs with Mr. Chambers' staff representative that the footage depicts only the backs of staff, and therefore is not exculpatory. *See Piggie v. Cotton*, 344 F.3d 674, 679 (7th Cir. 2003) (court may review camera footage *in camera* to determine

whether it is exculpatory). Therefore, the fact that the hearing officer did not view the camera footage did not violate Mr. Chambers' due process rights.

### 2. Fair Notice

Next, Mr. Chambers contends that he was denied fair notice of what conduct constitutes a disciplinary violation because he never received a rule book at AUSP Thomson, which he contends is required under the Bureau of Prisons' Admission and Orientation Program, *see* Bureau of Prisons Program Statement 5290.14. Mr. Chambers does not specify what part of 5209.14 requires that he be given a rule book by each new institution to which he is relocated, nor does he point to authority establishing that due process requires each institution to give him a rule book. AUSP Thomson is not Mr. Chambers' first institution, *see* Dkt. 20 at 135-73 (grievances Mr. Chambers filed at each of his institutions), and the Bureau of Prisons' Inmate Discipline Program, which identifies assault as a prohibited act, presumably applies at all facilities, *see* Bureau of Prisons Program Statement 5270.09 ("Inmate Discipline Program"), Table 1 Prohibited Acts and Available Sanctions #224. Moreover, Mr. Chambers was previously disciplined and lost good conduct time on multiple occasions in 2016-18, either for assault or threatening bodily harm, and so cannot seriously contend that he was unaware that assaulting others was prohibited. *See* Dkt. 20 at 182-85 (Mr. Chambers' disciplinary history).

### 3. Lt. Murillo

Mr. Chambers argues that he was denied due process when Lt. Murillo delivered the incident report to him. He contends that Lt. Murillo delivering the report created a conflict of interest because Lt. Murillo was also involved in the underlying incident. An official directly involved in the incident cannot served on the board that hears the charges against an inmate. *See Piggie*, 342 F.3d at 667. But Mr. Chambers does not contend that Lt. Murillo played any role in deciding the disciplinary proceedings against him, and therefore has not established any due process violation based on Lt. Murillo delivering the report.

### 4. Incident Report to FBI

Mr. Chambers argues that he was also denied due process because a case manager lied when stating that his incident report was forwarded to the FBI. But Mr. Chambers points to no authority establishing that due process requires incident reports be sent to the FBI. In any event, according to the incident report itself as well as a document entitled "Referral of an Inmate Criminal Matter for Investigation," the incident report was sent to the FBI on September 30, 2019, after which on October 2, 2019, FBI special agent C. Awender declined to act on the referral. Dkt. 20 at 84-85 (incident report), 86-87 (criminal matter referral form). Accordingly, his assertion that the incident report was never forwarded to the FBI is contradicted by the record.

### 5. Denied Right to Present Witnesses and Evidence

Mr. Chambers contends that he was denied due process because he was "denied the right to present witness and exculpatory evidence at the DHO hearing." Petition [1] at 2. Mr.

Chambers does not identify the witnesses or exculpatory evidence he contends he was not allowed to present, leaving the Court unable to assess whether his due process rights were impacted. Moreover, his assertion that he was denied witnesses and exculpatory evidence is unsupported by the record. According to the DHO report, Mr. Chambers exercised his right to present witnesses: two of the witnesses he requested were unavailable but submitted written statements (Special Investigative Agent Ramirez and Unit Manager Woods), while two others did not submit written statements (an unidentified FBI agent and Lt. Martinez). Dkt. 20 at 80.

Although *Wolff* establishes that due process entitles a prisoner to present witnesses at a disciplinary proceeding, it does not entitle the prisoner to "call witnesses whose testimony would be irrelevant, repetitive, or unnecessary." *Pannell v. McBride*, 306 F.3d 499, 503 (7th Cir. 2002). As to the two witnesses who did not submit written statements, Mr. Chambers has not identified what testimony or statements they would have given. According to the government, neither witness was present for the events described in the incident report and so would have had no first-hand knowledge of what occurred. According to the DHO report, the only statement Lt. Martinez could have offered would have been a description of what is depicted in the camera footage, but such a statement would have been redundant of the statement from his staff representative, who had already described the camera footage for the hearing officer. Dkt. 20 at 80. Accordingly, Mr. Chambers has not identified any due process violation based on being unable to present witnesses or evidence.

### 6. Incident Report Delivered Late

Next, Mr. Chambers contends that he was denied due process because he received the incident report five days after the incident to intimidate and retaliate against him. Under Bureau of Prisons regulations an incident report is "ordinarily" delivered to an inmate within 24 hours of the incident. 28 C.F.R. § 541.5(a). However, when "it appears likely that the incident may involve criminal prosecution, the investigating officer suspends the investigation," in which case the incident report should be delivered to the inmate by the end of the business day following release by the investigating agency. Inmate Discipline Program § 541.5(b). According to the incident report itself, the FBI released the matter on October 2, 2019, the same day Lt. Murrilo delivered the incident report to Mr. Chambers. Dkt. 20 at 84. Therefore, Mr. Chambers has not identified any violation of Bureau of Prisons policy. The Court notes further that due process requires only that an inmate receive notice of the charges against him 24 hours before any hearing. *Wolff v. McDonnell*, 418 U.S. at 564. Mr. Chambers' disciplinary hearing occurred nearly a month after he received the incident report, and so he has identified no due process violation stemming from the delivery of the report.

### 7. Staff Violated 28 C.F.R. § 541.5 and § 541.7

Mr. Chambers contends that his due process rights were violated when staff violated Bureau of Prisons regulations at 28 C.F.R. §§541.5 and 541.7(a)(4). Section 541.5 lays out the inmate disciplinary process, beginning with the filing of an incident report, *see* § 541.5(a), the investigation of the allegations in the incident report, including informing the inmate of the charges against him, *see* § 541.5(b)(1), obtaining a statement from the inmate, *see* § 541.5(b)(2), and attempting to informally resolve the matter, *see* § 541.5(b)(3). Mr. Chambers has not

specified what provision of § 541.5 he contends staff violated, other than his separate argument addressed earlier that staff delivered the incident report late. Therefore the Court has no ability to address this argument further.

Likewise, he does not specify how staff violated § 541.7(a)(4), which requires the UDC to automatically refer incident reports involving Greatest or High severity prohibited to the DHO. Incidents involving assault are among the High severity prohibited acts. *See* Inmate Discipline Program, Table 1 Prohibited Acts and Available Sanctions. As required, the UDC referred Mr. Chambers incident report to the DHO. *See* Dkt. 20 at 83 ¶ 19. In his reply brief Mr. Chambers first alleges a violation of § 541.7(b), under which a UDC "ordinarily" consists of two or more staff. However, "[o]nly one unit staff member is required to hold an initial review when the incident report is required by policy to be referred to the DHO." Inmate Discipline Program § 541.7(b). Because Mr. Chambers' incident report involved a High severity prohibited act, the UDC consisting of only a single staff member could refer the disciplinary proceeding to the DHO.

Accordingly, Mr. Chambers has not identified any violation of due process for violations of §§ 541.5 or 541.7.

### 8. Neither the FBI Nor SIS Never Prepared a Report

Next, Mr. Chambers argues that he was denied due process because there were no reports from the FBI or the Special Investigation Supervisor. In his reply brief he seems to take a different approaching, contending that an FBI report does in fact exist and that it would have been exculpatory given that the FBI reviewed the incident report but decided not to prosecute him (which contradicts his earlier assertion that the incident report was never forwarded to the FBI).

Mr. Chambers has identified no requirement that either the FBI or SIS prepare a report. To the extent he contends that the FBI prepared a report but it was never presented as evidence at his hearing, his contention is not supported by the record. The DHO report states that the hearing officer considered the incident report, Dkt. 20 at 81, and the incident report states that the FBI had reviewed it and released it for administrative processing, *id.* at 84. Nothing in the record indicates that the FBI prepared any other report. Moreover, the FBI could have declined to pursue a criminal investigation for any number of reasons other than insufficient evidence of an assault, including that the matter was already being handled administratively by the Bureau of Prisons. In any event, even if its decision not to pursue a criminal investigation could be viewed as exculpatory, the hearing officer already reviewed that information in the incident report.

### 9. Bureau of Prisons Delayed Processing his BP-10 in violation of 28 C.F.R. § 542.15

Finally, Mr. Chambers contends that the Bureau of Prisons violated 28 C.F.R. § 542.15 by taking more than the 30 days allowed to process his BP-10. That regulation sets out deadlines by which an inmate must file his appeals to exhaust his administrative remedies, including 20 days to file a BP-10 form with the regional director appealing the warden's response to his initial

grievance, and 30 days to file a BP-11 form to appeal the regional director's response to his BP-10. It does not set a 30 day deadline for the Bureau of Prisons to process his appeals. Regardless, the government concedes that Mr. Chambers exhausted his administrative appeals, and so his deadlines to exhaust have no bearing on his due process claim.

## CONCLUSION

For the reasons given, Mr. Chambers' petition [1] is denied, and this case is closed. Mr. Chambers is advised that this is a final decision ending his case in this Court. If he wants to appeal, he must file a notice of appeal with this Court within 60 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Mr. Chambers need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if he wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). A Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi). The time to file a Rule 59(e) or 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2).

To the extent one is required, the Court declines to issue a certificate of appealability. *See* Rule 11 of the Rules Governing § 2254 Cases. Mr. Chambers cannot show that reasonable jurists would debate, much less disagree, with this Court's resolution of his § 2241 petition. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2), and *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Date: September 15, 2021     By: _____
                                                         Iain D. Johnston
                                                         United States District Judge